May it please the Court. My name is Gerald Barrett. I'm with the Phoenix Law Firm of Ward, Keenan & Barrett. I represent Charles Anderson in this matter and did a trial. This is a fraudulent transfer case arising under the Arizona Fraudulent Transfer Act. And we fundamentally are dealing with two errors by the District Court. First, in its original findings, it made the timing of the debtor's bankruptcy or insolvency outcome undeterminative to all theories, including that of actual intent under ARS section 44-1004A. In this regard, the Court categorically rejected consideration of all transactions which occurred prior to that time. In its initial order, though, the Court granted relief under 1004A1 and 2 for postpetition transfers. We addressed this error in a Rule 52 motion. And the District Court denied our motion but materially restructured its decision by claiming it never intended to grant relief for an actual fraud case under 1004A1. Moreover, the Court announced something that remains perplexing. It said that while it had rejected the defense of familial obligation to justify the transfers, it nonetheless found these transfers influenced its decision as to whether there was actual intent to hinder, defraud, or delay creditors. May I ask you, sir, if you were correct that the District Court didn't make any A1 findings of actual intent, except based on timing? I'm sorry. I misstated myself. If you're correct that he was incorrect on timing, where does your familial obligation argument fit into that? Well, it's their defense. And, Your Honor, I think if you read the Rule 52 order, it indicates. I don't understand it. So that's why I'm asking you what your position is. I'm going to ask counsel what his is. Mr. McDonald, at trial, essentially urged that all of these transfers could be defended by way of a familial obligation, that they were transfers made for either past real estate transactions or they were transfers made to support the family. Those, and particularly with respect to the wage transfers, Mr. McDonald argued that, hey, look, this really was just simply a device to fool the IRS and to call these wages, but they were really just husband paying ex-husband, paying for support for his family. Those concepts were rejected explicitly by the District Court and remain rejected by the District Court, even after the Rule 52 order, but yet the judge said the argument influenced his decision. Your Honor, in response to your question, I wish I could give you further insight as to what the District Court judge was thinking, but I can't. Clearly, in the under 1004a1, the actual fraud case, mindset of the debtor and the recipient of the property come into play. You can show actual fraud through direct evidence. Mr. Barrett, one of the things that troubles me is I'm not sure how to apply the District Court's factual finding, which essentially discredited the planned trustee's evidence and ruled, as I read it, that the trustee failed to provide clear and convincing evidence of the fraud in regard to the real property transfers. Your Honor, we made a mistake in approaching this case by sort of overshooting. We alleged a claim under all three parts of the statute. For two parts of the statute, the 1004a2 claim and the 1005 claim, we needed to show the debtor's financial status, and in particular, under 1005, we needed to show his insolvency. Our expert was discredited in his conclusion that Mr. Michelson was insolvent as of January 1994. Under the actual fraud claim, under the 1004a1 claim, Mr. Michelson's insolvency was but one of many factors to look at. We proved the mechanics of each one of these transactions without the expert's testimony. We proved these transactions through ---- Aren't you asking us to reweigh the evidence? You're not really addressing the concern I have. The concern I have as an appellate judge is I have a factual finding that you failed to meet your burden of proof by clear and convincing evidence, and that finding is influenced by the trial judge's discrediting of your key expert witness. What I hear you arguing to us is that you want us to overlook the finding, the adverse finding of fact and rule contrary to the finder of fact, that you did indeed establish that proof, and the error occurred when the fact finder disagreed with you. And I don't know how we can do that. Your Honor, the analytical framework that the district court started with was bankruptcy or insolvency as outcome determinative. That's what Mr. Miller testified about. Mr. Miller testified and Mr. Miller alone testified and offered an opinion as to when Mr. Michelson was bankrupt. Mr. Miller testified and offered an opinion for each of the other transactions that were pre-petition. We proved those matters through the testimony of Kevin Michelson, Celeste Michelson, and or through documents. There is no dispute from the other side as to our description of those events. In fact, many of those facts were stipulated to in the pretrial order. Those facts were ignored by the district court under its analytical framework that bankruptcy was outcome determinative. They've never been addressed by the district court. Wait. May I understand something? Bankruptcy or insolvency is outcome determinative for 1005 and for 1004. Is it B-2 or A-2? A-2. Yes, A-2. All right. But your position is that it is simply one of a whole lot of facts that can be taken into consideration for A-1. Yes. And that given the bankruptcy court's construct that insolvency was also outcome determinative for A-1, then its fact findings are simply not determinative.  Is that your position? Your Honor, maybe if I can better address Judge Tolman's concern. The wages clearly illustrate the problem. Starting in 1995 when Celeste Michelson relocated to Phoenix, Arizona, Kevin Michelson decided to increase her wages from what had been $15,000 a year to in the $30,000 to $40,000 range. There's a finding that she did less work. There's a finding that that money was not paid for return value. Those findings apply equally to 1995, 1996, 1997, and 1998. There's no difference in the record to suggest any difference. The judge decided, though, because bankruptcy was outcome determinative, that he would grant us relief only for the 1997 and 1998 wages. And those payments to Mrs. Michelson that were more than $15,000 a year had two badges of fraud under 1004B, payment to an insider and insufficient consideration to the transferor, right? As found by the court. And additionally, the record makes clear there's additional badges of fraud. Mrs. Michelson and Mr. Michelson both knew that a lawsuit had been filed by Mr. Anderson to collect the money, is the primary one. And that's a very, very important factor when you look at that this is to an insider. This is to a white man. Kagan. That gets into Judge Tolman's concern about findings, the fact that we can't do anything about it, doesn't it? I mean, you're saying there are other additional badges. No, Your Honor, there is a finding that she knew that a lawsuit was what had been filed. I think it's finding number 29. There's a finding that she knew the lawsuit had been filed because, again, he goes to this bankruptcy as outcome determinative error, a clear error. He never makes a conclusion of law as to whether or not that becomes a badge of fraud. But the finding is made. There's a finding that Celeste Michelson knew the lawsuit had been filed. There's a finding that Celeste Michelson knew that the government had raided the property. The gap here is in the outcome determinative status. Now, with all due respect, the Rule 52 order is disingenuous by saying that the Court never intended to make a finding under 1004A1. Number one, it would not have made badges of fraud findings had it not intended to do that. And there's at least three explicit findings that there was relief being granted under both A1 and A2. The case got away from the district court magistrate. We tried this case in May. We waited and waited and waited for a decision. Compelled by the local rule, we filed not one but two notices after the Court had not issued its decision after six months. But the judge found that the expert had been successfully impeached. And ordinarily, when we have that situation, the expert obviously was the one who was going to help the Court quantify the damages. And the Court picked a much lower number on damages than what you saw. If this were a jury trial and the jury did that, we would shrug our shoulders and say, well, you know, that's the justice that is rendered when a jury disregards or discredits the testimony. Maybe they compromise on the amount of the money that they're going to award, even though they find that there was some sort of fraud here. But, Your Honor, I think this is not a jury trial. But he is the magistrate is sitting as the trier of fact, is he not? It's a bench trial. But we have a clear explanation of what he was doing and why he committed error. When a judge applies, a trial judge applies the wrong standard to the facts, this Court has de novo review. The point is it's the same as if he made an error in instruction. Yes, Your Honor. If it were a jury trial. Yes. Yes. And so he's never looked at it. And what I was going to follow up with, Your Honor, is when he finally issued a decision in January, he indicated that the reason for the delay was the parties had requested a continuance on filing proposed findings of fact. It's true we did. We proposed jointly that we went from May 31st of Friday to June 3rd of the very next Monday. The district court, in what becomes sort of a disturbing lack of credibility, said that that delay allowed other matters to take precedence. Well, wait a second. You're now accusing the district judge of lying to you as to why he delayed? That's fairly serious. Your Honor, I'm suggesting to you that the stipulation to move the findings from a Friday to a Monday, using that as a justification for the delay. When you look at the other things the district court judge does, where it flip-flops on the 1004A1, reflects that sometimes things are being put on paper that aren't exactly accurate. It's difficult for me to understand, Your Honor, other matters coming in and taking precedence over that weekend. I'm not being critical for the judge delaying issuing the decision. Well, he's a magistrate judge. Magistrate judge. I mean, they do have other duties that sometimes involve night and weekend work. It's possible, Your Honor, but it's hard to believe that that was the reason for the 7-month delay. And I certainly don't want to make my case on that basis. What I'm suggesting to you, though, is that when you look at the Rule 52 order, there is this flip-flopping on what relief he was granting. He found badges of fraud on the wage transfers post-bankruptcy. And we submit to you that had he examined the multiple transfers prior to the bankruptcy, he would have likewise found them. The facts are there. There's absolutely no doubt that they're there. Your Honor, I've got about five and a half minutes, so if I'd like to reserve five minutes briefly. He found that Celeste Michelson was an innocent receiver of this property. It's hard to believe that somebody who knows they're not performing work yet getting paid wages is an innocent receiver of the property. And likewise, we've made arguments about the attorney-client privilege. In this case, in the pretrial order, they indicated that they were going to defend with respect to the St. Charles property on the return value based on what the lawyer had told them. It's a matter of fairness. It's a matter of whether or not they can both use that as a shield and a sword. There were documents inadvertently produced. We are not suggesting the inadvertent production carries any consequence. But in the context of a fraudulent transfer case, we believe that the record would have allowed us to inquire into what communications were offered by the lawyer. Well, was that defense actually raised at the trial? In the pretrial order, it was, Your Honor. At the trial. Because as I read the briefs, I thought there was a suggestion made that when this issue arose, the judge said, you know, well, I'll take it up if the defense is actually raised, but that there was no further discussion of the issue for the rest of the trial. Is that not correct? Your Honor, they backpedaled off that defense. Well, I can understand why, because they didn't want to open the door to waive the attorney-client privilege. But I think they opened the door in the pretrial order. Well, did they put the evidence, the defense on or not? That's the relevant issue. Was it an issue in trial? It was not a trial, Your Honor, but it was in the pretrial order. So where is the error, where is the abuse of discretion by the trial judge in preserving the sanctity of the attorney-client privilege since it wasn't raised as a defense? Your Honor, as I understand the impact of a pretrial order, it's to put the issues on the table. It's to tell everybody, including the Court, what issues are being litigated. And once you put the issue into play, I'm not aware of any authority that allows you to withdraw it simply because you may stumble. They took the position. You can always withdraw a defense in trial. I don't think you're going to get very far that way. Maybe you ought to reserve the rest of your time. Yes, Your Honor. Thank you. Please, the Court. My name is Mel McDonald. I'm with the law firm of Jones, Skelton and Hockeley in Phoenix, Arizona. I'd like to start out with the point raised by Judge Talman about the accusation against the trial judge. As I've read the brief and as I've heard the argument, the accusation was made by the appellant's counsel that the judge was fudging on the truth and actually misstated the record. I would urge you, when looking at the transcript, I've been doing this for 35 years. I have never seen a trial like this trial as to the credibility of their star witness. Well, what does the credibility of their star witness have to do with legal error if there were legal error? Because what they tried to do is they were going to put in the standard of their expert witness who was going to put in these badges of insolvency. And he absolutely collapsed. All right. That's fine. But what the magistrate judge, and I have no quarrel with the district court's findings of fact. I mean, I don't think you can touch them in a bench trial. But for the life of me, I cannot read the magistrate judge's order any different than to say, look, bankruptcy is outcome determinative, and it's outcome determinative on A1 as well as A2 and 1005. And that's just not right. So if you've got that legal error, you may come – it may come out exactly the same way, and I'm sure it will, given this judge's attitude toward the problem. But don't we still have to reverse and tell him to clean up his order? I really don't believe so, and I'll tell you why. In his finding, I think insolvency has to be triggered somewhere. The only reason you're going to – But insolvency is just one of a dozen badges of fraud to be considered under A1. I agree completely it is outcome determinative on A2 and 1005. But it is not outcome determinative, as I read the statute, under A1. Well, I think what the A1 does, though, is it makes it discretionary. In other words, it uses the may language, not the shall. He can consider that. And I think what this judge did is he looked at how awful their testimony from their people, their experts was. I agree. And so he was entitled to find, okay, one of those badges of fraud didn't exist when she started to collect wages after she moved to Arizona. He was entitled to say that. But that's not enough for A1, is it? Well, I really think it is. I think what the judge was trying to say was, look, when you look at the A2 and the 1005 statute, those are insolvency determinative, and there's no evidence at all. I agree. When we then go to the A1 argument. Which he never went to. Well, he didn't go there because I think, you know, maybe he should have said, I've gone there and I don't find it. But the fact of the matter is when you look at it, there's no question that the transfer went to an insider. It was his wife. When you looked at the evidence that was developed, though, in 1995, her husband is a philanderer. They're breaking up the marriage. She's moving in. Plus, can you explain the difference in wages? There is no difference. There is nothing that can be pointed to in the record that explains why pre-bankruptcy wages weren't treated the same as post-bankruptcy wages, except that the district judge had the law wrong. Well, I think one other explanation is the difference between the Chicago wages and the Arizona wages is that they were living in the same house at the time. And this is why I was trying to persuade the district court judge, the magistrate judge, that you've got to take in some of the familial obligations. They're no longer living under the same roof. They've got the separate expenses in Arizona. And while they were trying to couch them in terms of wages. Well, that's all true. But, I mean, you know, or let's assume that's the case. Nevertheless, post-move wages pre-bankruptcy were not treated the same. And the only conceivable explanation for that is that the district court thought that insolvency was outcome determinative on A-1. Well, as I read his order, especially his revised order, I think he concluded I don't even need to go there. Okay. I agree that that's apparently what he did. But how could he do that? Because the union, pretrial order, argument, the whole bit, preserved. Nobody ever dismissed A-1. It's still out there. I agree it's still out there. But I think there's two reasons that would explain it. Number one reason is that the evidence is so overwhelming on the A-2 and the 1005 statute that he doesn't see a need to go there. And number two, since it's couched in terms of may, it's discretionary on the badges of fraud, he simply didn't feel that up until the later transactions that met the burden of any kind of a badge of fraud. There may be a badge of fraud there, but when he makes the express finding that they haven't sustained anything, they haven't proven the insolvency. And he didn't do that on A-1. He just he backed off of any A-1 finding apparently for reasons which are certainly unclear to me. Let me give an example of, and I thought this out in anticipation. Let's assume that in 2002, I take a fee that's due my law firm and put it in my own pocket, don't report it. In 2001, I pay my child, one of my children's education. Then I'm breaking up with my wife, so in 2002, I give her a car and then I give her a ring. Well, clearly there's badges of fraud, but the whole purpose of the A-1 statute is to say, is he specifically intending to defraud creditors? And you can use the badges of fraud to point to the intent, but what we did in the trial is demonstrate when we went through the property settlement in 1995 that they were legitimately trying to divorce but not divorce, if you will. Yeah. Mr. McDonnell, I have to keep at it one more time and then I'll shut up, but I have no quarrel with any of the fact findings. I can't. I mean, so I think you, I mean, assuming you're perfectly correct that the evidence supports the findings of fact, if there's legal error on one claim, don't we, do we have any choice but to send it back and at least let the magistrate judge clean up his order? And no doubt he's going to come out your way. I don't have much doubt that he will. At least now, three years later, he's not going to, he's going to just say to heck with it. Judges, it's my belief from the record and the verbiage that he used, he may not have said this is how I'm finding the A1 order, but from the overpowering statements he made on the other, I think he believed that the badges of fraud aren't going to help you. You lose anyway. And I think it's so implicit in the record that I don't think you need to send it back on that one point of law. There's a number of reasons why I think the judge fell so strongly and why I think the appellant's counsel is really so unfair in attacking his integrity on it. And you've got to be careful. I'm not attacking his integrity, but I sure as heck don't understand what he did with his words. I'm sorry? I don't understand what he did with his words. I'm not attacking his integrity, but the two orders make absolutely no sense. Well, I think they make sense when you look at the A2 and the O5, and I think he made it crystal clear that there's no insolvency, that you lose, and it doesn't trigger until bankruptcy. I really believe that what he has tried to do with the A1 is to simply say the A2 is so overpowering, there's nothing there. I don't think you can go back. And I think that the problem is that the A1 is the different gifts I've given to my own children over the years or to my wife if we're breaking up and I'm trying to keep her here, it still requires under the A1 an intention to defraud the creditors. And they say, well, we'll let you look at some of this to help the plaintiff in his burden of proof, but it still has to show the intention to defraud the creditors. They haven't done that, and that's the problem that I have with their argument. I think what they did is they went into the trial trying to prove all three, put all their ducks in the basket of their expert, and the expert turned out to be a disaster. I mean, literally, he had $143,000 worth of errors in four or five different pieces of property. He didn't account for any of the double-dipping that was going on. There were literally hundreds of thousands of dollars of errors that he was making. The other thing that bothered me in this case, too, and it's right in the briefs, if you look at the briefs, they have asked you in passing down your decision and they listed their numbers on page 13 of their brief, they're saying there's 296,000 that they want you to reverse. Their whole claim in the court was for 269. They've already been paid $96,000 from the settlement. There was a bond that they got for 33,000, and then they had a settlement with Mr. Sokol for 32,000. What they're really doing is they're asking this Court and reversing to say, give us four and a half times basically what we were ever entitled to, disregard all the money that we've been paid, and I just think it's wrong and they can't do it. I think there's one other troubling aspect of this also. There are really two different judgments, if you will, that considered the amount that should be considered under the fraudulent conveyance. There was a criminal restitution, which, as Your Honors well know, in a criminal case, the U.S. district court judge had to look at every penny and make sure that his finding was for 99,000. And I tried to impress upon this with the trial court that, yes, the bankruptcy judge came in with a 269 figure, but at the time, Kevin Michelson was not defending it. You had IRS agents sitting in the back of the courtroom. He's under criminal investigation, and so they took it laying down. Well, but he invoked the Fifth Amendment, too. I mean, I think it's a little unfair to make the argument that the criminal court was somehow better informed than the magistrate judge who conducted a full trial on the merits counsel. You mean the bankruptcy judge? The bankruptcy judge. Yeah. I'll tell you why I think there is a difference. In the bankruptcy case, Kevin Michelson was not participating, if you will, by way of his testimony. When they would come up with accusations, because he's invoking the Fifth Amendment privilege, and there hasn't been a criminal charge yet, he's got to remain silent. He'd be nuts not to. In the criminal case, he's now able to answer some of the allegations. Mind you, they walked in there with their $269,000 to the judge and said, here, let's find this amount. This judge looks and had the availability of the bankruptcy judgment and order, but he's going to have to pay the restitution. And the judge talked about this in his order. He said, well, while I prefer the bankruptcy inference on it, he says it really doesn't make any difference because the restitution or the judgment I'm going to enter in this case is really right within the Zagel ballpark of the $99,000 that he fined, and so I think it was no harm, no foul. Now, let me just indicate a couple of other things that I think were really significant in the underlying evidence of the trial. There was evidence that Kevin Michelson, during many of these time periods in question, was a highly successful painting contractor. In fact, there was evidence from Mr. Sokol, who had worked at Sherman Williams, that his success was in part due to his low overhead. No question. Part of the success, but also his contract he had was with Poldy Homes. He was the main painting contractor. I might tell you, Your Honor, I'm not the chairman of the Kevin Michelson fan club. The guy was a crook. There's no question about it. I think that was the strategic mistake that Mr. Barrett and his clients made in the  They walked into the bankruptcy case and walked all over him because Kevin Michelson couldn't defend it and didn't defend it. And there was all kinds of bad things he did. But I think they made the fatal mistake when they came out to Arizona, well, we'll just kind of go on our laurels, we'll put all of our ducks in the one basket with our expert, and we'll go in and we'll prove the case. She stood up to him and we were able to show throughout that they didn't show and they couldn't show insolvency. If they could show it, they decided not to do it. They didn't bring their experts to Arizona. They didn't put on any evidence. And so now they're coming back and saying, well, gee, rescue us because we probably put on the worst witness to ever testify in the federal court. Rescue us by going to the 1A statute. And I simply think that the judge made it so crystal clear that even if you don't like the verbiage he used on the A-1 statute, I think he made it crystal clear that it's not going to help anyway, that even though there may be a badge of fraud, they didn't show me anything. And just like if I've given gifts to my wife and my kids over the years, but I've stolen money from my law firm, even though there's badges of fraud, you've still got to show that when I made those gifts or made those transfers that I was doing it with the idea of defrauding my law firm. And that's what I don't think they're going to be able to show. I'd be happy to answer any other questions. Thank you very much. I appreciate the honor of being here. Mr. Barrett. Thank you. Two quick things. One is the amount we're seeking. We're seeking up to the full amount of the judgment entered by the bankruptcy court. The transactions total exceed that amount, but obviously we're not entitled to a judgment beyond that amount and have never claimed it. As to the difference between the criminal restitution order and the amount found by the bankruptcy court, Judge Duncan actually found in our favor on that topic and there's no, has not been any appeal taken on it. Ultimately, the argument suggests that we have put all of our ducks in Mr. Miller's basket, the expert witness. It just ain't true. As to the question of actual fraud, we relied on the testimony of Kevin Michelson and Celeste Michelson. We presented a brief to you that probably was too long, too long describing the facts, but well annotated, not ever with a citation to Mr. Miller's testimony, but to the testimony of Kevin Michelson and Celeste Michelson. What did Celeste Michelson say about the St. Charles property, the family residence? Well, she said she contacted a lawyer because I wanted to get an opinion from an attorney to protect the house, so the kids and I had something. I didn't go on to find out about Kevin. It was about the house. She claimed she needed to protect herself from Kevin further encumbering the property. Well, she then agreed that, number one, she knew she didn't need to have an order, that she had the power just simply not to sign an encumbrance. But as soon as the postnuptial agreement was signed that Quick claims the house, the family house, to her, she allowed him to further encumber the property. To buy gazebo. Pardon? To buy gazebo. Yes. And she said if they're going to sue me, they're going to sue me. This was for me. If I sold my house and left Kevin, then I could go and I could get something else. And that's what I eventually did. She was an active participant in the scheme to transfer all of the property in Kevin's name to her. The sham corporations that they created, the paper trails they created, were all part of a scheme to transfer a considerable amount of property from Kevin Michelson's name to Celeste Michelson's name. And that was proved not through the testimony of Philip Miller, the expert witness who was testifying about insolvency. It was proved through the testimony of Kevin Michelson and Celeste Michelson. While we certainly agree with Judge Reimer that there's a fatal flaw here in the reasoning, we further suggest that the judge's findings simply was fatal under the clearly erroneous standard. There is ample evidence with respect to these transactions, not from the expert witness, but from the Michelsons to show there was actual intent to defraud creditors. The wages provide the clearest example. That's the only one commented on the judge. Everything else he's silent on because of his error in applying the standard of law. I apparently am out of time. Okay. Thank you both for your argument in this matter. Thank you. And the matter just argued will be submitted and the Court is adjourned.
judges: Rymer, Tallman, Bea